IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| TRANSTEXAS GAS CORPORATION, | § | CHAPTER 11 |
| ET AL., DEBTORS | § | CASE NO. 02-21926 |
| | § | (Jointly Administered) |
| US BANK, NATIONAL ASSOCIATION, | § | |
| AS LIQUIDATING TRUSTEE, | § | |
|     PLAINTIFF | § | |
| | § | |
| VS. | § | ADVERSARY NO. 03-2109 |
| | § | |
| JOHN R. STANLEY, SR., | § | |
|     DEFENDANT | § | |

**FINDINGS OF FACTS AND
CONCLUSIONS OF LAW**

On this day came on for consideration the trial of the above-captioned adversary proceeding.  The Court, having heard the evidence and arguments of counsel, makes the following Findings of Fact and Conclusions of Law.  To the extent that any of the following findings of fact are deemed to be conclusions of law, they are adopted as such. To the extent that any of the following conclusions of law are deemed to be findings of fact, they are adopted as such.

**<u>FINDINGS OF FACT</u>**

**PROCEDURAL HISTORY**

1.    On November 14, 2002 (the "Petition Date"), TransTexas Gas Corporation, Galveston Bay Pipeline Company and  Galveston Bay Processing Corporation (hereinafter sometimes referred to as "the Company") each filed a voluntary petition for relief under Chapter 11 of the U.S. Bankruptcy Code (the "Bankruptcy Code") in this Court.

1

2.     This Court confirmed the Creditors' Joint Plan of Reorganization for Debtors, including TransTexas Gas Corporation ("TransTexas" or the "Company") under Chapter 11 of the Bankruptcy Code, submitted by Thornwood Associates LP dated as of June 27, 2003, modified July 8, 2003 (the "Plan") by Order dated August 14, 2003.

3.     Under the terms of the Plan, a Senior Noteholders Liquidating Trust Agreement dated as of August 28, 2003 (the "Liquidating Trust") was established.  U.S. Bank National Association, Plaintiff, is the Liquidating Trustee (the "Liquidating Trustee") under the terms of the Liquidating Trust.  The Liquidating Trustee has standing to bring the claims asserted in the complaint.

## FACTUAL HISTORY

4.     TransTexas Gas Corporation, a subsidiary of National Energy Group, was primarily engaged in the business of exploration, production and transmission of natural gas and oil, primarily in South Texas.  The Company filed for Chapter 11 protection in April of 1999, with the U.S. Bankruptcy Court due to financial difficulties.  The Company's Reorganization Plan (the "March 17, 2000 Plan") was confirmed and became effective March 17, 2000.

5.     The March 17, 2000 Plan provided that John R. Stanley, Sr. ("Stanley") be granted a three year employment agreement ("the Agreement") (Exhibit 30), the principal terms of which were, as follows:

a.     He would serve as the Chief Executive Officer of the Company and control one seat out of five on the Company's newly constituted Board of Directors — the remaining four seats would be occupied by so-called independent directors who

2

were not otherwise affiliated with the Company and were selected by the Company's Senior Creditors:

        b.      He could only be terminated for cause during the first two years of the Agreement;

        c.      Upon termination for reasons other than cause he would be entitled to a severance payment of three million dollars ($3,000,000), or one million five hundred thousand dollars ($1,500,000) if terminated for cause, and no payment if terminated for certain non-economic cause factors. Significantly, in the event of a voluntary resignation at any time during the terms of the Agreement, he would not be entitled to any severance payment. (Exhibit 30, Section 6)

        6.      Also, pursuant to the March 17, 2000 Plan, Stanley would own approximately 10 percent of the class A common stock, 100 percent of the Class B common stock, and warrants for the purchase of additional Class A common stock, the exercise of which would give Stanley more than twenty percent of the Class A common stock.

        7.      According to the first quarter SEC form 10(Q), ending April 30, 2000 (the Company's fiscal year commences on February 1), the Company's net worth was sufficient to pay and retire the Senior Secured notes of approximately two hundred million dollars ($200,000,000) but was insufficient to confer any equity on the Preferred Shares (owned by the Senior Secured Creditors) or the common stock, including the stock owned by Stanley. (Exhibit 17)

        8.      In view of the financial condition of the Company as of the date of confirmation of the March 17, 2000 Plan, the Company was only marginally solvent.

Moreover, under the terms of the senior secured notes, interest was to be paid semi-annually, and commencing in two years, cash dividends were required to be paid to the preferred shareholders.

9.      In January 2001, the Board retained the law firm of Boyer and Ewing to investigate allegations of wrongdoing by Stanley, including financial irresponsibility and overspending, conflicts of interests, and misuse of the Company's personnel.  In a report prepared by Boyer and Ewing, they concluded that the Board had a valid basis for terminating Stanley for cause. (Exhibit 16) However, the Company did not then terminate Stanley.  Had Stanley been terminated for cause pursuant to Boyer and Ewing's report, Stanley would have been entitled to no more than a $1,500,000 severance pay and possibly no severance pay, depending on the specific basis for the termination.

10.     By the Fall of 2001, the Company was in severe financial distress.  Thus, the Company had established a separate reserve account of fifteen million dollars ($15,000,000) to be used to pay upcoming interest payments to the Senior Secured Noteholders.  The next such payment was due in March 2002.

11.     In November and December 2001, the Board of Directors, including Stanley, authorized the use of the separate reserve account to fund operations of the Company, thus leaving it with inadequate capital or other sources to pay the March 2002 interest payment. (Exhibits 1-4)

12.     Moreover, the financial statements submitted to the Board of Directors and the quarterly statements filed with the SEC show that as 2001 progressed, the Company fell deeper into insolvency.  Thus, the assets of the Company, including proved

reserves, developed and undeveloped, were insufficient, net of liabilities, to pay the amount owed to the Senior Noteholders (Exhibits 17-23).

13.     On or about January 30, 2002, the Board of Directors met in an Executive Session meeting after which they announced their intention to exercise the severance option of Stanley's Employment Agreement.  (Exhibit 5) However, no effective date was established for the severance.  Moreover, the Minutes of the meeting reflect that the Board assumed, without stating any basis, that the Employment Agreement would require a severance payment to Stanley, regardless of the basis of the severance and regardless of whether it was a resignation.

14.     Between January and March 2002, however, Stanley remained as Chief Executive Officer and member of the Board of Directors while he negotiated the terms of termination with the Company and the Board.

15.     In March 2002, Stanley and the Company agreed that he would be permitted to resign and would be entitled to receive three million dollars ($3,000,000), payable in installments, the first of which would be one million dollars ($1,000,000) in April 2002 and installments thereafter.  In order to avoid the express terms of the Employment Agreement, which did not require any severance payment on resignation, the Board acceded to a term in the Separation Agreement that treated Stanley's resignation as a termination without cause. (Exhibit 31, page 1).

16.     As of March 2002 and the date on which the Company agreed to make the payments set forth in the preceding paragraph 15, the company had insufficient capital and financial resources to make the interest payment due the Senior Secured Noteholders or fund certain contractually committed drilling operations.  In fact, the Company was

forced to borrow moneys from one of the Senior Secured Noteholders to meet the March 2002 interest payment. However, this loan was insufficient to fund the contractually committed drilling operations and pay Stanley the down-payment and subsequent installments under his separation agreement. Consequently, the company, by the Board of Directors, of which Stanley remained as a member, decided to abandon the drilling operations, which caused a loss of the Company's interest in the subject leases. These leases would not have been lost, had the Company not agreed to or otherwise refused to pay Stanley. Moreover, in a letter to the Board of Directors dated April 1, 2002, Arnold Brackenridge, the Chief Executive Officer, who replaced Stanley, stated that the Company would not generate more than $110 million in a sale, far less than what was necessary to pay the Company's obligations, including the amounts owed to the Senior Noteholders. (Exhibit 5, letter dated April 1, 2002, USB 005873)

17.     As of March 2002, the Company knew that it would not be able to engage in any meaningful drilling operations or meet its obligations to the Senior Noteholders and Preferred Shareholders in the absence of either (a) an infusion or capital or (b) a bankruptcy restructuring, (Exhibit 5, USB 5874 et. Seq.)

18.     In fact, from March 2002, until the November 2002, filing for bankruptcy, the Company did not engage in any meaningful drilling operations.

19.     Plaintiff and Defendant each retained expert witnesses to opine on the Company's solvency in the period January through March 2002. The Court finds that the financial statements of the Company demonstrate that the Company was insolvent during that period without regard to the opinion of either expert. Specifically, defendant's expert, in criticizing plaintiff's expert's opinion, relied on an estimated oil and gas

reserves that were not proved, but only probable or possible. The Court finds that the best evidence of the value of the Company's assets during the relevant period are the financial statements of the Company and the estimated proved reserves, both of which demonstrate that the Company was insolvent (See Netherland Sewell estimate of proved reserves, Exhibit 10, USB 6173). The Court also finds that management presentations in 2002 conclusively establish that the Company could not continue normal business operations. (See e.g. Exhibits 4, 5 and 10).

## THE TRANSFERS

20.     Stanley and the Company entered into a Separation Agreement ("Separation Agreement") on or about March 14, 2002, which required the Company to pay Stanley $3,000,000 in installments. (Exhibit 31) The first installment of $1,000,000 was due and payable no earlier than seven days following the execution of the Separation Agreement, and subsequent installments of $300,000 each were due and payable on the 15th of the each month, beginning on May 15, 2002 (the payments are sometimes herein referred to as the "Transfers" or the "payments").

21.     The parties stipulated that the Company actually made the following payments to Stanley:

  a.      $1,000,000 (Severance Pay) 3/21/02

  b.      $600,000 (Severance Pay) 6/14/02

  c.      $300,000 (Severance Pay) 7/15/02

  d.      $300,000 (Severance Pay) 8/15/02

  e.      $70,794.90 (Interest payments on Severance Pay) 3/2102-8/15/02

          Total $2,270,794.90

22.     The Transfers were not arms length transactions or made as part of an arms length transaction, but were made to benefit Stanley at the expense of the Company and its creditors.

## INSIDER STATUS

23.     Stanley was a director, officer and/or a person in control of the debtor from before March 2000 through at least March 14, 2002.  Thus, Stanley was an insider as that term is defined in 11 U.S.C. § 101(31) at the time that the Company and Stanley agreed between January and March 2002 that the Company would pay Stanley three million dollars ($3,000,000).

24.     The Court further finds that Stanley exercised actual control of the Company during the period of negotiations for his severance by, among other things, threatening litigation against the Company and its Board of Directors if his demands for the above-referenced payments were not met.  Mr. Stanley, for example, testified that he was informed that the Company was afraid he was going to sue.  (Stanley trial testimony, page 98).

25.     Stanley's position as Chief Executive Officer and Chairman of the Board of Directors did not change between January and March 14, 2002, during which period Stanley maintained his Company office, attended Board Meetings, and acted as the most senior member of management.  Nothing in the evidence of this case supports the conclusion that Stanley abandoned or otherwise changed his status during this period.

## INSOLVENCY OF TRANSTEXAS

26.     TransTexas was insolvent as of March 14, 2002, or would become insolvent by virtue of the financial obligations required by the Separation Agreement.

8

27.     Plaintiff's expert, John R. Young ("Young") testified that there are three recognized methods to determine insolvency: balance sheet test, cash flow test and adequate capital test.  A company need only fail one of the tests to be considered insolvent.  Young's testimony reflects the findings set forth in two reports, which he prepared and were offered and admitted into evidence as Exhibit 32.

(1)     *The Balance Sheet Test*

This test determines whether the company's asset value is exceeded by its liabilities.  It is important that this test include those assets and liabilities that are contingent or prospective.

(2)     *The Cash Flow Test*

This test looks at the company's ability to pay its debts as they mature.  It is essentially the movement of money in and out of the business that helps determine the business' solvency.

(3)     *Adequate Capital Test*

This test is intended to determine whether the company is likely to survive after "the transaction" in question occurred.  Essentially, it tests whether the company has sufficient capital, post-transaction, to survive in the normal course of business.

28.     Although Young expressed no opinion with respect to the Balance Sheet Test in his report, at trial he opined that the Company would be insolvent based on this test, if only the value of Proved Reserves was used.  (Young trial testimony at pages 127, 128).  Therefore, the Court finds that the Company did not meet this test based on the financial statements of the Company and the estimated amount of its proved reserves, as

well as the Chief Executive Officer's report to the Board on the value of the Company on April 1, 2002.

29.     Young testified that the most important component of short term success for a company is liquidity or the ability to pay its bills; and that the Company was having difficulties paying its debt obligations by the fall of 2001.  By March 2002, the Company had three major debt commitments that the Company could not entirely finance:

(1)     Stanley's severance payments;

(2)     Debt service payments; and

(3)     Production payments.

30.     The Company's cash position was poor.  The Company had to borrow cash against its production payments to finance operations.  Cash flow was not sufficient to continue with normal business operations, including both drilling activities and servicing debt requirements.  Because the Company was not able to pay its creditors, the Company was insolvent as of March 2002, in accordance with the cash flow test.

31.     Financial ratios provide a mathematical calculation in measuring a company's solvency from a cash flow perspective.  Young testified that various financial ratios pertaining to solvency and liquidity were computed for the Company from February 2001 – October 2002.  Though standard ratios can vary among industries, the majority of financial institutions consider a company solvent when their quick ratio is greater than 1.0, current ratio is greater than 2.0 and net working capital is greater than $0.  Young testified that based upon the above analyses, the Company was insolvent as a result of all three financial calculations.

10

32.     The adequate capital test is used to determine if a company is likely to survive in the normal course of business after a specific transaction/business matter has occurred.  Young testified that upon review of the Company's Board of Directors meeting minutes, in particular October 2001 – March 2002, various items noted pertain to the Company's lowered cash availability and ability/inability to fund debt and severance payments to Stanley.  Specifically, on December 19, 2001 it was noted in the Board of Directors minutes that the Company would need to use the remaining $5 million of interest reserve in order to meet their working capital requirements for the month of January.  In the February 14, 2002, Board of Directors minutes, a Board member summarized discussions that had been held with GMAC concerning a $3 million over advance.  In the March 12, 2002, Board of Directors minutes, it was noted that a discussion was held regarding potential sourcing of cash to fund Stanley's severance payments, including the use of production payments.  Being cognizant of the Company's inability to fund Stanley's severance payments, a member of the Board requested a cash flow projection showing the Company's "ability" to fund Stanley's severance payments.  No such report was prepared.

33.     In Mr. Solomon's (Mr. Stanley's expert witness) report dated May 5, 2005; he refers to the TransTexas Gas Corporation 10-K noting that for fiscal years 2002 and 2003 the Company had the ability to finance ongoing operations by means of production payments, creditor borrowings, oil and gas sales and continuing operations.  However, Mr. Solomon's trial testimony makes clear that his analysis was fundamentally flawed that it assumed that the Company's possible and probable reserves should be given the same weight as proved reserves, an opinion that is contradicted by the financial

11

statements of the Company and the opinions of management. Moreover, the Petrie Parkman valuation done a year later was consistent with the financial reporting of the company and inconsistent with Mr. Solomon's analysis. Moreover, Mr. Solomon conceded that if he included only the proved reserves in his analysis, the Company was insolvent during the relevant time periods. (Solomon trial testimony, page 185). Mr. Solomon also agreed that if the Petrie Parkman analysis was materially accurate insofar as the status of the Company in early 2002, then the Company was insolvent. (Solomon trial testimony, page 197).

34.     Simon Ward, a senior vice president of the Company during the relevant periods, testified that the value of probable and possible reserves was no more than ten cents on the dollar. (Ward trial testimony, page 51). Mr. Solomon also testified that even if the reserves were valued at $100 million, or nearly 40 million more than the proved reserves, the Company would still be insolvent. ($100 million would result if one valued the unproved reserves at ten cents on the dollar.) (Solomon trial testimony, page 185).

35.     Young also testified, and the financial statements and Board of Directors' minutes confirm, that during this time, the Company was having financial difficulty paying debts as they became due. The Court concludes that based upon this information, it is highly unlikely that TransTexas would have been able to obtain additional financing to continue operations as of at least March 2002. This fact was substantiated in November 2002 by TransTexas' filing for bankruptcy.

36.     Young testified that as an additional analysis, the Company's financial ratios were compared to oil and gas industry averages for the calendar year ending 2001 and that the Company's was below industry average for all ratios.

37.     Mr. Solomon also agreed that if the Company knew in March 2002 that it could not meet its debt payments obligations in November, 2002, it failed the cash flow test and was insolvent.  (Solomon trial testimony, page 201.)

38.     For all of the above reasons, the Court concludes that the Company was insolvent because (a) its liabilities exceed its assets under the Balance Sheet test; (b) the Company was unable to meet current debt obligations from both a debt to equity and debt ratio standpoint, thus rendering the Company insolvent on and after March 14, 2002, through the petition date; (c) the Company failed to pass the cash flow and adequate capital test from December 2001 through May 2002, thus rendering the Company insolvent from a financial standpoint on and after March 2002 through the petition date. The Company's inability to pay its debts as they became due contributed to the Company's filing of bankruptcy in November 2002, which in itself confirms TransTexas' insolvency.

39.     Each of the payments made by the Company to Stanley from March 15, 2002 to August 15, 2002 were made despite the Company's full knowledge of its insolvency and its inability to meet its obligations when due.  Moreover, the Board of Directors knew or should have known that the payments to Stanley would contribute significantly to the Company's default on its required debt service payments and dividend payments to the Senior Secured Noteholders and Senior Preferred shareholders of TransTexas.

40.     The Company paid Stanley the Transfers through August 15, 2002, for a total of $2,200,000, in principal amount of severance payments, notwithstanding its continued insolvency throughout that period.

13

41.     The Company also paid Stanley an additional $70,794.90 in interest on the obligations imposed by the Separation Agreement during the preference period. The total avoidable payments, therefore, were $2,270,794.90.

42.     Neither the Separation Agreement nor the payments to Stanley were for fair value or consideration in that (a) Stanley voluntarily resigned, thus entitling him to no severance payment under the Employment Agreement; (b) such payments would not have been made had Stanley been terminated for certain cause factors, among which were the stated basis in the Boyer and Ewing report; (c) the consideration recited in the Separation Agreement, including the proxy to vote Stanley's shares, the agreement to perform services during a transition period, the release and covenant not to sue, and other supposed consideration, were illusory and of no equivalent value to TransTexas; (d) the "negotiations" between the Company and Stanley on the terms of the Separation Agreement were lacking in substance and good faith in that the Board of Directors had decided to terminate Stanley in January 2002, but nevertheless permitted him to resign and have such resignation treated as a termination without cause; (e) the Board's concern that Stanley might sue the Company or the Board was illusory, especially since the Employment Agreement specifically categorized any severance payments as "liquidated damages," and therefore procuring Stanley's release was of no value and (e) in any event Stanley was an insider throughout the period of January to March 14, 2002.

## LIQUIDATION ANALYSIS

43.     The First Amended Joint Disclosure Statement for Debtors (docket 640), together with the Reserve Reports and Analysis of Oil and Gas Reserves demonstrate that upon liquidation, no distributions would have been made to unsecured creditors and

common shareholders. The Company was insolvent at the time of each of the Transfers. Each Transfer allowed Stanley to recover more than he would receive if these cases were cases under Chapter 7, the Transfers had not been made, and Stanley received payment of his debt to the extent provided by Title 11 of the U.S. Code.

## BADGES OF FRAUD

44.     The following badges of fraud as set forth in Section 24.005(b) of the Texas Uniform Fraudulent Transfer Act are present in this case in connection with the Transfers: the Transfers were to an insider, Stanley; the value of the consideration received by the Company was not reasonably equivalent to the value of the Transfers to Stanley because Stanley had no claim as a result of his resignation; the Company was insolvent or became insolvent at the time the Transfers were made or the obligation was incurred; the Board of Directors and the Company knew that the Company could not meet its ongoing operational and contractual commitments regarding drilling and pay Stanley.

45.     The Transfers were also made to an insider, Stanley, for an antecedent debt, TransTexas was insolvent at the time of the Transfers and Stanley had reasonable cause to believe that TransTexas was insolvent.

## Attorney's Fees

46.     Plaintiff has incurred reasonable attorney's fees and expenses in connection with the prosecution of this adversary. In accordance with the practice of this court, Plaintiff should file a fee application conforming to the Local Rules.

## CONCLUSIONS OF LAW

### JURISDICTION AND VENUE

1.      The Bankruptcy Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334 and §157.

2.      This adversary arises out of and is related to the Chapter 11 proceeding bearing Case No. 02-21926, In re TransTexas Gas Corporation, et al, pending in the U.S. Bankruptcy Court for the Southern District of Texas, Corpus Christi Division.

3.      Venue is proper in this Court and this District pursuant to 28 U.S.C. § 1409.

4.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2),(E),(F),(H) and/or (O).

5.      The statutory basis for the relief requested in the complaint are 11 U.S.C. §§ 502(d), 544, 547, 548, and 550 and Rule 7001 of the Federal Rules of Bankruptcy Procedure.

### AVOIDABLE PREFERENCE: 11 U.S.C. § 547

6.      11 U.S.C. § 547(b) provides:

> (b)  Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property –
>
> (1)  to or for the benefit of a creditor;
>
> (2)  for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> (3)  made while the debtor was insolvent;
>
> (4)   made –

(A)  on or within 90 days before the date of the filing of the petition; or

(B)  between ninety days and one year before the date of the filing of the petition and if such creditor at the time of such transfer was an insider; and

(5)  that enables such creditor to receive more than such creditor would receive if –

(A)  the case was a case under chapter 7 of this title;

(B)  the transfer had not been made; and

(C)  such creditor received payment of such debt to the extent by the provisions of this title.

11 U.S.C. § 547(b).

7.      This Court takes judicial notice of the docket in the Chapter 11 cases jointly administered under Case No. 02-21926 maintained by the Clerk of the Court, including without limitation, all pleadings and other documents filed, all orders entered, and all evidence and arguments made, proffered or adduced at the hearings before this Court during the pendency of the Chapter 11 cases, including, without limitation, the disclosure statement hearing and the confirmation hearing.

8.      Stanley was a creditor of TransTexas by virtue of the obligations arising under the Employment Agreement and the Separation Agreement and the Transfers were to or for the benefit of Stanley, a creditor of the debtor.  Section 547(b)(1) is satisfied.

9.      TransTexas was insolvent as of March 14, 2002, or would become insolvent by virtue of the financial obligation required by the Separation Agreement. Each Transfer was made while the debtor was insolvent.  Section 547(b)(5) is satisfied.

10.     Each Transfer was made within one year of the Petition Date.

17

11.     Each Transfer allowed Stanley to recover more than he would receive if these cases were cases under Chapter 7, the Transfers had not been made, and Stanley received payment of his alleged debt to the extent provided by Title 11 of the U.S. Code. It is undisputed by the parties that Stanley would have been a general unsecured creditor in a Chapter 7 proceeding to the extent he had a valid claim in which the Company had insufficient assets to pay secured creditors or unsecured creditors in full.  Section 547(b)(5) is satisfied.

12.     For purposes of determining insider status, the Court finds that the Company's agreement to pay Stanley $3,000,000 in installments was negotiated and arranged while Stanley was an insider within the meaning of 11 U.S.C. § 101(31).

13.     Stanley was admittedly an insider at the time the Separation Agreement was signed.  That installment payments were made to Stanley after his resignation and when he was no longer an insider is legally irrelevant, since otherwise the purpose and meaning of the preference status with regard to transfers would be thwarted by the mere agreement to make installment payments.  Moreover, Stanley's resignation was conditioned upon the Company's agreement to pay him $3,000,000, and therefore the agreement to pay $3,000,000 occurred while Stanley was still an insider. *In re EECO, Inc.* 138 B.R. 260, 265 (Bankr. C.D. Cal. 1992); "One who ... uses an insider position to put in motion a step-transaction, such as a golden parachute severance package or stock buyout agreement, cannot become a non-insider for purposes of that transaction by simply saying "I resign.")

14.     Defendant points out that there is a conflict in the reported cases on the issue whether to determine insider status at the time of the "arranged obligation" or on

the dates of the actual payments. However, defendant points to no Fifth Circuit case dealing with this issue and a review of the literature indicates that even those courts that supposedly apply the "exact date approach" do so on facts vastly different from the instant case. *See e.g., In re Camp Rockhill, Inc.,* 12 B.R. 829 (Bankr. E.D. Pa. 1981) (where the transferee did not perfect the security interest until many months after he ceased being an insider and the transferee had never been an officer or director of the transferor, but simply changed his status from stockholder to creditor.) Thus, the Court had no occasion to determine whether the change of status was the operative date for determining insider status.

15.    The Court is persuaded that both the legislative history of Section 547 and the policy and goals of preference avoidance actions are best served by adopting the "arranged" approach to the facts of this case. See, discussion in 31 UCLA L. Review 1541 (1994). Moreover, defendant's reference to the Supreme Court's decision in *Barnhill v. Johnson*, 503 U.S. 393 (1992) is unavailing, because there the Supreme Court was dealing with a ninety-day non-insider preference action and therefore did not consider the issue of date of transfer for the purpose of determining whether the transferee was an insider. The point of the insider rule, of course, is that it extends the ninety-day look back period to one year for obvious policy reasons relating to preventing an insider from using his position to seize an inequitable advantage over other creditors. Thus, the Supreme Court's analysis in *Barnhill* is inapposite precisely because it assumes that the transferee had no control over the timing of the transfer, whereas an insider, by definition, does have such control.

16.     Of particular significance in the instant case is that Stanley resigned. Quite apart from the curious fact that this resignation was then treated in the Separation Agreement as a termination without cause, presumably lending a supposed imprimatur of legitimacy to the payment of $3,000,000, it was Stanley who decided to leave the Company, once he had secured the arrangement to receive the severance payments. Moreover, that Stanley negotiated an immediate payment of $1,000,000 supports this Court's adoption of the "arranged" approach, because the amount of the down payment was approximately the amount that the Company forfeited when it abandoned a contractual commitment to drill the Snapper well, a decision Stanley, as Chief Executive Officer and Board member, joined in, if not determined with the Board's assent.

17.     The flaw in defendant's argument that on the facts of this case the Court should look to the actual date of payments is exemplified by its misplaced reliance on the recent case, *Mann v. GTCR Goldier Rauner, LLC,* 351 B.R. 708 (D. Ariz. 2006). There, the Court did not adopt the "arranged" approach, but it chose not to because the transferee had resigned several days before the challenged Asset Purchase Agreement was executed. In the instant case, however, Stanley did not resign until March 14, 2002, which resignation was only effective provided the Company signed the Separation Agreement obligating the Company to make the severance payments. (Exhibit 31). Thus, Stanley was in fact an insider when he signed the Separation Agreement, whereas the executive in *Goldier* was indisputably not an insider when he signed the challenged Asset Purchase Agreement.

18.     The Court finds that the proper test for determining whether the transferee was an insider is to determine whether the challenged transfers are a function of the

20

insider status of the transferee. *In re EECO, Inc.* 138 B.R. 260, 265 (Bankr. C.D. Cal. 1992). In other words, the Court concludes that the proper approach for determining "insider" status is to view all of the challenged payments to Stanley as a part of a single transaction, beginning when the Separation Agreement was made. See *In re Consolidated Industries Corp.* 292 B.R. 354, 364 (N.D. Ind. 2002). Here, the Company agreed to pay Stanley while he was an insider, and but for the Company's strained financial condition and is inability to pay Stanley the entire $3,000,000 in a lump sum, there would have been no installment payments after his resignation. The evidence is clear that the agreement to pay Stanley was in fact a function of his insider status, and he negotiated the agreement to pay $3,000,000 while he was still an officer and director of the Company. Section 547(b)(4)(B) is satisfied.

19.     With respect to whether the obligation was an antecedent debt, the Court looks to three relevant events, the execution of the Employment Agreement in March 2000, the Board's determination to terminate Stanley in January, 2002, and the date of the execution of the Separation Agreement on March 14, 2002. Each of these dates preceded the first payment to Stanley on March 21, 2002.

20.     The Fifth Circuit in Matter of *Southmark Corp.,* 62 F.3d 104 (5th Cir. 1995), held that under the facts of that case, the debtor incurred its debt to its former employee at the time of termination, not at the time of signing of the employment contract that called for payment of severance benefits. *Id.* at 106. Here, even if the Employment Agreement is not the antecedent debt (and in further distinction, there is no claim here that termination breached the 2000 Employment Agreement, which was self-executing in the event of termination), the Separation Agreement clearly established a

21

debt, which was antecedent to the installment payments. Moreover, the Court can also look to when the Company actually decided to terminate Stanley, thus triggering the obligation to pay him $3,000,000. It is clear that his decision was made in January, 2002, since the Board of Directors resolved at the January 31, 2002 meeting to invoke the "severance option," and it directed management to secure funding for the severance obligation. Thus, each of the installment payments, including the initial payment of $1,000,000, were transfers on account of an antecedent debt, whether the debt was incurred at the time of the Board's decision to terminate, the execution of the Separation Agreement, or the execution of the original Employment Agreement. See, *In re Intercontinental Publications, Inc.*, 131 B.R. 544, 549 (Bankr. D. Conn. 1991).

21. In *Southmark*, the Court held that the date of termination was simultaneous with the creation of the debt. *Southmark*, supra at 106. In the instant case, on the other hand, the execution of the Separation Agreement occurred several days before the first installment was delivered to Stanley. Thus, here an antecedent debt exists. Moreover, execution of the Separation Agreement occurred nearly two months following the Board's decision to terminate Stanley. Moreover, the Company's designation of March 14, 2002, as the Separation Date was a mere formality, since the original Employment Agreement prohibited termination for cause during the first two years. Since the Company's decision not to terminate Stanley for cause (in fact, he resigned) was in effect a self-fulfilling prophesy to justify the payment of $3,000,000 to Stanley, rather than a payment of $1,500,000 for a termination for economic cause, or no payment for termination for non-economic cause or voluntary resignation, the Court finds that the termination was, in real effect, in January 2002, thus creating an antecedent debt

22

as early as January 2002 but in no event later than the execution of the Separation Agreement on March 13, 2002, a week before the initial installment payment and months before subsequent installment payments.

22.     To further confirm that the payments were made for or on account of an antecedent debt, the $3,000,000 obligation accrued interest on the unpaid balance, which Stanley was also paid in the amount of $70,794.90.  Clearly, interest was accruing for precisely the reason that the payments (Transfers) were made on account of an antecedent debt.

23.     Thus, for the foregoing reasons, the Transfers were made on the account of an antecedent debt.

24.     The Transfers are preferences under 11 U.S.C. § 547 of the Bankruptcy Code for the reasons stated above.

25.     Stanley has the burden of proof of any alleged affirmative defenses. Stanley failed to meet his burden on any affirmative defense.  Moreover, the Court finds that the payments to Stanley were not ordinary, recurring transactions, i.e., payments in the ordinary course of the Company, as there is no evidence that it was the ordinary course of business of the Company to convert resignations into terminations, or to amortize alleged severance obligations of the Company, of for that matter incurring the severance obligation at all, because it would not be an obligation if the Company terminated Stanley for non-economic cause or Stanley resigned, and even in a termination for economic cause, the obligation would have been only $1,500,000 rather than $3,000,000.

26.     The Transfers are avoided and judgment is entered against Stanley in the amount of $2,270,794.90.

### FRAUDULENT TRANSFER: 11 U.S.C. § 548 and TEXAS UNIFORM FRAUDULENT TRANSFER ACT

27.     Plaintiff has pled for relief under the bankruptcy fraudulent transfer statute, 11 U.S.C. § 548, and under the Texas Uniform Fraudulent Transfer Act, Section 42.001 et seq., Tex. Bus. & Com. Code.

Section 548(a) of the Bankruptcy Code provides:

(a)(1)  The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within 1 year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became , on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

The Texas Uniform Fraudulent Transfer Act, Section 24.005, Tex. Bus. & Com. Code, provides the following:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer

was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor;

      (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

      (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

(b) In determining actual intent under Section (a)(1) of this section, consideration may be given, among other factors, to whether:

      (1)    the transfer or obligation was to an insider;

      (2)    the debtor retained possession or control of the property transferred after the transfer;

      (3)    the transfer or obligation was concealed;

      (4)    before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

      (5)    the transfer was of substantially all the debtor's assets;

      (6)    the debtor absconded;

      (7)    the debtor removed or concealed assets;

      (8)    the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

      (9)    the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

      (10)    the transfer occurred shortly before or shortly after a substantial debt was incurred; and

      (11)    the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Section 24.005, Tex. Bus. & Com. Code.

The Texas Uniform Fraudulent Transfer Act, Section 24.006, Tex. Bus. & Com. Code, provides the following:

(a)      A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(b)      A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

Section 24.006, Tex. Bus. & Com. Code.

28.      "The value of consideration given for a transfer alleged to be in fraud of creditors is determined from the standpoint of creditors." *In re Hinsley,* 201 F.3d 638, 644 (5th Cir. 2000). "The proper focus is on the net effect of the transfers on the debtor's estate, the funds available to the unsecured creditors." *Id.* In the instant case, the net effect of the Separation Agreement and the subsequent payments was to remove $2,270,794.90 from the debtors' estate, making the funds unavailable to the creditors of this estate.

29.      Any lack of intent on Stanley's part to defraud the creditors of the Company is not relevant since he is not a purchaser for value. *See Roland v. United States,* 838 F.2d 1400, 1403 (5th Cir. 1988) *cited with approval in, In re Hinsley,* 201 F.3d at 644. Stanley is not a mere transferee who took in good faith and for a reasonably equivalent value given the significant level of his participation in the structuring of the Separation Agreement. The record reflects that he obtained the terms he desired in the Separation Agreement through overreaching tactics and had specific criteria for the

26

amount of funds he required in connection with his departure from the Company. Moreover, Stanley did not exchange equivalent value for the Transfers he received pursuant to the terms of the Separation Agreement because he resigned.  Under the Employment Agreement, resignation terminated any obligation of the Company to pay Stanley any severance payments.

30.     The consummation of the Separation Agreement and the subsequent payments were made with the actual intent to hinder, delay, or defraud creditors and entities to which TransTexas was or became indebted, on or after the date that the Transfers were made or the Separation Agreement and its obligations were incurred. Support for this conclusion lies in the following: (a) the Board of Directors was concerned that Stanley would sue them, although the record fails to reflect any legitimate basis for such a lawsuit; (b) the Board had a basis to terminate Stanley for cause, but did not do so: (c) the Company abandoned drilling operations in order to pay Stanley; and (d) the Company could have filed bankruptcy at the time of the Stanley separation, and Stanley would have been only a general unsecured creditor, standing behind the claims of the Senior Noteholders, who were secured creditors.

31.     TransTexas received less than a reasonably equivalent value in exchange for the obligations imposed by the Separation Agreement; TransTexas was insolvent on the date of execution of the Separation Agreement; and TransTexas was left with unreasonably small capital for the then business or intended business or transactions of TransTexas.

32.     TransTexas intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured as a result of entering into the

Separation Agreement.  This is evidenced by the factors stated above and that in fact the Company failed to make the second installment payment of $300,000 when due.

33.     TransTexas' delivery of the Transfers including he Separation Agreement and subsequent payments are avoidable fraudulent transfers under 11 U.S.C. § 548 and the Uniform Fraudulent Transfer Act, § 24.001, et. Seq., Tex. Bus. & Com. Code.

34.     The Separation Agreement and the other payments are voided and judgment is entered against Stanley in the amount of $2,270,794.90 plus pre-judgment interest at the legal rate.

35.     Any claim asserted by Stanley against TransTexas or its estate is hereby disallowed in accordance with 11 U.S.C. § 502(d).

### POSTJUDGMENT INTEREST

36.     Post judgment interest shall accrue on the damages awards at the applicable federal judgment rate.

### ATTORNEY'S FEES AND COSTS

37.     Plaintiff has applied for an award of reasonable attorney's fees and all costs of court.  In accordance with the practice of this court, Plaintiff should file a fee application conforming to the Local Rules.

Corpus Christi, Texas on this _____, day of _____, 2007.

_____
Richard S. Schmidt
United States Bankruptcy Judge